(100 South. 325)

## CHILDREN'S AID SOC. v. DAVIS et ux.
### (3 Div. 638.)

(Supreme Court of Alabama. Jan. 31, 1924. Rehearing Denied May 29, 1924.)

1. **Parent and child ⊚⟩2(3)—Right of parents to custody of infant children based on interests of children and good of public.**

The law devolves the custody and care of infant children upon their parents, not so much on the ground of natural right, but because the interests of the children and the good of the public will generally be promoted thereby.

2. **Parent and child ⊚⟩2(3)—Parents who left child on doorstep of strange household held not entitled to custody thereof as against persons who had taken and cared for child.**

Parents who left child born between four and five months after marriage on doorstep of strange household, and who did not claim child until parenthood had been discovered, though they knew or could have ascertained where child had been placed, *held* not entitled to its custody, under Acts Sp. Sess. 1920, p. 90, as against husband and wife who had taken and cared for the child and were in position to give it a good home.

Gardner, J., dissenting.

Appeal from Circuit Court, Montgomery County; Leon McCord, Judge.

Petition of the Children's Aid Society, and cross-petition by C. S. Davis and wife, for custody of a child. Decree for cross-petitioners, and the petitioner appeals. Affirmed.

W. T. Seibels and W. A. Jordan, both of Montgomery, and Tate & Reneau, of Wetumpka, for appellant.

The custody of the child was in the child welfare department, and could be retaken whenever such department saw fit. Acts 1919, p. 695. The natural ties and affection of the parents should not be ignored in determining what is best for the child. Cook v. Echols, 16 Ala. App. 606, 80 South. 680; Montgomery v. Hughes, 4 Ala. App. 245, 58 South. 113.

Hill, Hill, Whiting & Thomas, of Montgomery, for appellees.

The sole question involved is: What is for the best interest of the child? Ellis v. Jones, 208 Ala. 45, 93 South. 832; Dunn v. Christian, 202 Ala. 486, 80 South. 870; McDaniel v. Youngblood, 201 Ala. 260, 77 South. 675.

SAYRE, J. This is a controversy concerning the custody of a male child now something more than one year of age. This child, when about two months old, was left by its father on the doorstep of a stranger household in the city of Montgomery. Through the kind offices of a physician, and with the approval of an agent of the Aid Society, the child was placed in the custody of appellees, who were told that the Aid Society would control its future placement, but at the same time were confidently, but not officially, assured that they would be allowed to keep the child. At that time and for some time subsequent the parentage of the child was unknown. In May—and, it seems, after investigation had discovered the parents—the Aid Society petitioned the juvenile court praying that the child be declared a ward of the state, and dealt with accordingly. Appellees filed their cross-petition, praying that the care and custody of the child be left with them. June 27th, the juvenile court did decree the child to be a ward of the state, and ordered that it be committed to the custody and care of the Children's Aid Society until the further order of the court. Appellees took an appeal to the circuit court, where, August 4, 1923, after hearing the evidence, the court was of opinion that it was for the best interests of society and of the child that he be committed to the custody and control of cross-petitioners, C. S. and Laura G. Davis, and it was accordingly so ordered. The Children's Aid Society appeals.

[1] The evidence abundantly and beyond peradventure sustains the conclusion that this child is now fortunately placed, that it has found a deep place in the affections of its foster parents, and that no public institution could afford the same measure of prudent, capable, and affectionate care. The only debatable question is whether the child had better be committed to its natural parents, for it appears to have been admitted at the hearing that, in the event of a decree in favor of the Aid Society, the child would be placed with its parents. As expressed by the supervising agent of the society at the hearing, its purpose is to "try the child out with its parents." There are, it must be conceded, no sure grounds of decision, and so much of human interest is involved that the making of a decree is a matter of extreme delicacy, and of no inconsiderable embarrassment and responsibility. Striplin v. Ware, 36 Ala. 87. The statute does not contemplate that the humanity of the relation between parent and child should be disregarded, for that may shed a great light upon the question as to the interest of society and the welfare of the child. The law, for reasons founded in the nature of the relation, devolves the custody and care of infant children upon their parents, "not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted." To pursue the quotation from Striplin v. Ware, supra:

"So strong is the presumption, that 'the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all,' * * * that the parental au-

⊚⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

thority will not be interfered with, except in case of gross misconduct, or where, from some other cause, * * * it plainly appears that the interests of the child require it to be set aside."

It is in pursuance of these general principles that the statute (Acts Special Session 1920, p. 90) commands the court "to render such judgment as to it shall seem just, and to be for the best interest of society and for the welfare of such child"—such interest and welfare, according to our conception, being one and the same thing. Necessarily the judgment to be rendered must rest in inference, to be drawn from the facts in evidence, and we proceed to a statement, as brief as may be, of the salient facts of the case.

The parents, a young couple, live with the wife's father in the neighborhood of Tallassee. The father of this child for some months before the trial in the circuit court earned good wages as a carpenter, but his accumulated possessions amounted to his wearing apparel and a Ford car not paid for in full. Appellees, on the other hand, are well-to-do people living in the city of Montgomery. But, let it be understood, this difference in the circumstances of the parties, while it may signify much in the future life of the child, is by no means conclusive of the question here at issue, for, if these parents are to be deprived of the custody of their child, it must be for some weightier reason than that just suggested. We think such reason is to be found in the story of this child's birth and its life up to date. When it was discovered by the mother's family that she was gravid with this child, the prospective father and mother—to whom for convenience we may refer as appellants—went to Tuskegee, in company with the mother and brother of this mother, where appellants intermarried according to law. Then, evidently to conceal their folly, they went to Georgia, where this child was born between four and five months later. Two months afterwards, while in Montgomery, on their way back to Tallassee, this child was disposed of as we stated in the outset. Thereby appellants sinned away their right to the child.

[2] Appellants have their excuses, but they only make the matter worse. It is clear that their main purpose was to hide the evidence of their indiscretion, and it may be conceded that otherwise they would have kept and cared for the child. That choice needs no comment. The mother deposed that she did not consent to the disposition made of the child; but, evidently, her dissent was feebly expressed, for otherwise she would have clung to the child. The father deposed that he intended to leave the child with a friend, but he discovered his mistake when he saw a stranger take the child in, and did nothing. Next day these parents knew the child was at an infirmary, but said nothing. They testify that they were unable to trace the child further; but they confess that they did not inquire at the Welfare Department, although they knew an agent of that department had had something to do with the child's disposal, nor did they ever exhibit the least interest in this child until late in March, when they were made aware of the fact that their parentage had been discovered—that they would be exposed, and in some way held to account for what they had done. Considering the whole evidence, our opinion is that all the while they knew where the child was, and were entirely willing that it remain there, thus, without too great a strain upon conscience, relieving themselves of the burden of its care and the cold shoulder of their acquaintances. Our judgment is that the purpose of the statute will be served best by a decree leaving the present status of the child undisturbed for a time at least. In reaching this conclusion we lean in a measure upon the ruling of the trial judge, for, in addition to the facts as we have briefly stated them, he heard and saw all these people, and therein had an advantage which must be of peculiar value in a case like this.

Affirmed.

All the Justices concur, except

GARDNER, J. (dissenting). This case is in reality a contest between the natural parents of the child and a stranger for its custody, and is so considered and treated by the court. The ruling of the majority rests upon the theory that these parents had in fact abandoned the child and "sinned away their rights" to its care and custody. The parents insist what they did was meant as a temporary expedient to hide their shame, and it was their purpose to afterward repossess themselves of their child. The mother testified that what was done by the husband was over her protest. I am persuaded the youth of this couple should be considered in weighing their conduct. The mother was but 17, and the father 21. It is clear they were very anxious that the early birth after marriage of this child should not be known in their community, and to conceal it they added greatly to their sin; but much has been excused and condoned because of what more mature minds term the "folly of youth." All of the facts considered, I am not convinced these parents have forfeited their rights to their child, and therefore respectfully dissent.