189 So. 751

## CHANDLER v. WHATLEY.

### 6 Div. 466.

Supreme Court of Alabama.

May 18, 1939.

Rehearing Denied June 22, 1939.

John Busby, M. L. Taliaferro, and Stokely, Scrivner, Dominick & Smith, all of Birmingham, for appellant.

Clark Williams, of Birmingham, for appellee.

**BOULDIN, Justice.**

This appeal involves the custody of Bebe Chandler, a little girl seven years of age, daughter of Jesse Chandler and Lida Belle Chandler. When the child was three years old past, her custody was awarded to her mother in a divorce proceeding wherein the bonds of matrimony were dissolved between her parents. The wife obtained the divorce in an uncontested suit on the ground of cruelty. Some five and one-half months thereafter, the mother married Jimmie Whatley. A little more than three years later, the mother died at the time of the birth of another baby girl by her second husband. This second baby survives.

Immediately after the mother's death a question arose between Jesse Chandler, Bebe's father, and Jimmie Whatley, her step-father, as to her future custody. The step-father instituted the first proceeding by petition in equity in the same court which awarded custody to the mother in the divorce suit. The father then instituted habeas corpus proceedings before the same Judge at law. The proceedings were consolidated, and on final hearing, much of the testimony being taken orally before the court, the custody was awarded to the step-father. The father appeals.

By a long line of decisions in this court, as well as the courts of other states, the paramount or controlling consideration in dealing with the custody of an infant is the future welfare of the child. Citation of a few recent cases will suffice. Ex parte Fletcher, 225 Ala. 139, 142 So. 30; Ellis v. Jones, 208 Ala. 45, 93 So. 832; McDaniel v. Youngblood, 201 Ala. 260, 77 So. 674; Wright v. Price, 226 Ala. 591, 147 So. 886; Fletcher v. Preston et al., 226 Ala. 665, 148 So. 137.

This does not imply that in dealing with such delicate and often difficult question, the law disregards the natural rights of the father to the custody, companionship, care, and bringing up of his child. The child is born, a helpless infant, into the custody and keeping of his or her parents. Definite legal obligations of support, parental care and training with correlative right to the custody, control and services of the child spring at once out of the parental relation.

In Striplin v. Ware, 36 Ala. 87, this court declared the law in these words:

"The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for. When, however, this presumption is removed, and the morals, safety, or interests of the children, strongly require their withdrawal from the custody of the father or mother, the court of chancery (which is the general guardian and protector of all infants within its jurisdiction) will interfere, and place the care and custody of them elsewhere.—2 Kent, 205, 220-7; 2 Story's Eq. § 1340; Wellesley v. Wellesley, 2 Bligh. 128-30; DeManneville v. DeManneville, 10 Vesey, jr. 63, &c.; 3 Lead. Cases Eq. (edit. 1859) 270.

"Although this jurisdiction is firmly established, and seems indispensable to the morals, the good order, and the just protection of civilized society, it is admitted to be one of extreme delicacy, and of no

inconsiderable embarrassment and responsibility.—2 Story's Eq. § 1340. So strong is the presumption, that 'the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all'; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare,—that the parental authority will not be interfered with, except in case of gross misconduct, or where, from other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion, to be disturbed, unless it plainly appears that the interests of the child require it to be set aside."

In Stoddard v. Bruner, 217 Ala. 207, 115 So. 252, 253, a contest between the father and a blood relative on the mother's side, it was said: "Whatever may be thought of the case as between the husband and wife, the wife and mother having been removed from possible consideration, the right of the father remains to be considered in connection with the rule and practice of the courts which hold that the parent's right to the custody of his child should not be interfered with except on a strong showing that it is to the best interest of the child, and of the state, which also is concerned about the rearing of its children (Children's Aid Soc. v. Davis, 211 Ala. 344, 100 So. 325); the presumption being that these interests will best be served by the custody of the parent."

That case, as well as Children's Aid Soc. v. Davis, 211 Ala. 344, 100 So. 325, quote and follow Striplin v. Ware, supra.

■ Dealing with the fitness of the parent, in the text of 46 C.J. 1243, we find: "The unfitness which deprives a parent of the right to the custody of a child must be positive, and not merely comparative or speculative, and must be shown by clear and satisfactory proof, the burden of proof being on the person contesting the parent's right to the custody. No inflexible rule can be laid down by which unfitness may be determined, but each case must be decided upon its own peculiar facts." See, also, 46 C.J. 1228, § 11 c.

■ Again in 1 Schouler on Domestic Relations, § 744, we read: "In awarding custody of minors modern courts have often said that the welfare of the child is paramount, but this consideration will not suffice to take children from parents who are decent and responsible, if able to furnish the necessities for their children, although the child's welfare and prospects in life might be bettered thereby, but custody may be taken away from parents manifestly unfit by the State standing in loco parentis in equity."

■ It seems well settled that the natural and legal relations between parent and child are so interwoven with life and liberty that the courts are without power to take the child from the custody of the father and commit it to a stranger or an institution without notice and hearing— due process of law. Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81, 76 A.L.R. 238, and note p. 242; 46 C.J. 1251.

■ In the case before us the infant had been committed to the custody of the mother by decree. Such decree did not per se clothe the step-father with any right to the custody of the child as against the father after the mother's death. The relation of step-father was assumed voluntarily upon his marriage to the mother. The question of the proper custodian after the mother's death was an open one, to be determined on the facts of the case under principles above stated. 19 C.J. 349; Pinney v. Sulzen, 91 Kan. 407, 137 P. 987, Ann.Cas.1915C, 649; Bell v. Krauss, 169 Cal. 387, 146 P. 874; Yates v. Yates, 165 Wis. 250, 161 N.W. 743; Stone v. Duffy, 219 Mass. 178, 106 N.E. 595; In re Smith's Guardianship, Iowa, 158 N.W. 578.

■ The law, indulging the presumption that the welfare of this child will be best conserved by awarding her custody to her father, rather than the step-father, ordains that this shall be done, unless such presumption is overcome by clear and convincing evidence that the father is unsuited or unfit to assume the place of a father in providing a safe and comfortable home, proper environment, parental affection, care, training and education.

Many witnesses, in Jackson, Mississippi, where Jesse Chandler now resides, as well as in Birmingham, his former residence, give him a good character, regard him as a man of good morals, good background, a respected citizen. On the direct ques-

tion of his character and reputation, there is no dissent.

Evidence, also without conflict, shows he has now married a woman whose intelligence, good breeding and fine womanly qualities are unquestioned by any one. She has met Bebe; expresses full willingness to assume the relations of a step-mother. Nothing in the record would justify a finding that she will not make a good step-mother, just as Jimmie Whatley has unquestionably made a good step-father while his wife lived.

As for income and business capacity, it is without dispute that Jesse Chandler now has a good business connection in Jackson, Mississippi, has an income as a bond-salesman adequate to support his family, including his child.

His specialty is music. He receives some income from radio broadcasts with his orchestra at night.

Among the grounds upon which Jesse's fitness to have the custody and rearing of his child is alleged neglect, indifference, lack of fatherly affection as indicated by non-support of wife and child, and want of fatherly attention and interest during his wife's lifetime.

The life of Bebe, as relates to the attitude of her father, is roughly divided in two periods of approximately three and one-half years each.

When Jesse Chandler was married to Lida Belle, she was employed in a business office in Birmingham. Jesse's occupation was that of a musician, connected with a travelling orchestra. He was on the road, away from home, most of the time. His father and mother, good people with a home and adequate means, lived in Birmingham. The wife continued to work after marriage. For about a year preceding and following the birth of Bebe she lived with her husband in Jacksonville, Florida, where his orchestra was stationed. She spent a few weeks in Birmingham during confinement. Returning to Birmingham, the mother resumed her occupation as secretary in a business office. Jimmie continued his work as a musician. Bebe's home was with the elder Chandlers, paternal grandparents, her grandmother having her care during her mother's working hours. This status continued until an estrangement intervened, leading to divorce in May, 1935.

Without dispute among witnesses who knew, Jesse's fatherly affection for his child and the child's affection for him during this period were normal.

His income as a musician, not definitely shown, was inadequate. His father and mother, as well as his wife, contributed willingly to provide a good home for the child.

On January 25, 1935, Lida Belle sued for divorce. She asked for custody of the child, claimed nothing for support of either herself or child. It appears that after filing the bill, and getting a waiver of service, husband and wife went together into Virginia for a time. Returning to Birmingham the wife took the child, and for several months resided with her great aunt. Meantime the divorce was granted May 6th. Jimmie Whatley became a suitor in June, and they were married October 19, 1935. Lida Belle continued in her employment after this marriage. Her husband, Jimme Whatley, was also employed. The two had an adequate income.

They have lived, by a joint arrangement, in a home with Jimmie's father and mother, excellent people, with adequate income. Bebe, during this latter period, has had the care of Jimmie's mother, much as she had the care of Jesse's mother in former years. Since her mother's death, the mothering of Bebe devolves wholly on Jimmie's mother. The elder Whatleys have become much attached to the child. They want to retain this family relation. Jesse's father and mother, also fond of their grandchild, want her custody awarded to the father.

It is during this period that evidence is directed to non-support of the child, indifference, lack of fatherly attentions, &c.

■ As for non-support, no legal duty devolved on him at this period.

■ There is a general and continuous duty on the father to support and maintain his child in all events, if need be. This is a duty to society as well as to the infant he has brought into being.

■ This duty, as between him and others, may be shifted. On the marriage of the mother with another man, the latter does not per se, as step-father, incur an obligation to support her children. But when, as natural in a case of this sort, he takes the child into his family, puts himself in loco parentis, he becomes entitled to the services of the child, and has the primary duty, along with the mother, to support the child while this relation exists.

Englehardt v. Yung's Heirs, 76 Ala. 534; 46 C.J. pp. 1237 to 1239, §§ 181, 182, 183.

Jimmie Whatley and his wife, Lida Belle, having exclusive custody of this child, supported the child adequately, asking nothing of Jesse Chandler, the father. Whether they would have accepted the assistance of the father does not appear.

Touching the charge of neglect, indifference and the like, Jesse, quite naturally, never entered the Whatley home to see his child. It does not appear he was invited so to do. So, his companionship with his child was by arrangement to have her come to the home of his parents, the grandparents by blood, on occasions when he could conveniently be in Birmingham. At such times, those who knew his fatherly attentions, and affection for Bebe, and her affection for him, testify they were tender and wholly normal. Gifts and tokens of affection, so much stressed in argument, were not sent to the Whatley home, but evidence, which we see no reason to question, discloses they were sent on occasion to his mother to be there presented to the child.

We have prolonged this feature of the case, perhaps unduly, to the conclusion that there is no substantial ground upon which to find Jesse Chandler wanting in fatherly interest and affection for his child such as to render him unfit to have her custody and bringing up.

One thing is to his discredit. His wife obtained a decree of divorce on the ground of cruelty. The trial court refused, very properly, to go behind this decree and inquire into all the family affairs that led to it. It must be taken at face value. He did not contest the charge, but acquiesced and in a measure invited it by a formal answer, waiving notice, &c.

Not only did he permit, without active contest, this impeachment of his character, but thus contributed to the taking of his child out of his custody, opening the way to what followed, a step-father and his parents entering into the position they now occupy, with the ties of affection that have grown out of it. That they are good people, furnishing the child a good home, under good influences, and want to retain that status is without dispute.

Does this feature of the case call for a refusal to give the father the custody of his child? It is significant that the decree of divorce has not affected the standing and general character of Jesse Chandler in Birmingham or elsewhere. It appears, from witnesses testifying to good character, that they did not know the ground of divorce. The effect of this decree, stamping him with cruelty toward his wife, as evidence of unfitness to have the custody of his child, must be construed in connection with his general disposition, ideals, and character, as disclosed by the whole record.

As for the ties grown up between the step-father and the child, or between his parents and the child, much has been said, but not much force is given it in solving this case. All of them entered into the relation willingly, of their own choice, with imputed knowledge, that, in case of the death of the mother, the custody of the child should go to her own father, not strangers to her blood, unless the father was then an unsuitable person to have her custody and rearing.

The trial Judge permitted a questioning of the little girl in the presence of only himself and attorneys. We quote the following questions and answers:

"Q. Do you want to go with Jesse or do you want to stay with Daddy Jim? A. Yes.

"Q. There didn't anybody say that to you? A. No.

"Q. You are saying that because you feel that way? A. Yes.

"Q. Are they good to you there? A. They bought me a diamond ring."

We impute no purpose to influence the child by giving her a ring. We refer to it as clearly disclosing the immaturity of the child's mind thinking of the giving of the ring as the evidence of goodness toward her. We are mindful that in many cases the wishes of a child, who has reached sufficient maturity to form lasting ties, and make an intelligent choice, is given weight in the solution of the question of custody.

With a child of so tender years with no concept of her own interests in the years to come, one side having the advantage of immediate custody and association, her choice is of no moment. It is suggested Bebe now has a little half sister and it is to her advantage they be brought up together.

Rather does this present a difficult situation for all. The step-child being brought up in the home with the child of one's own

flesh and blood, with all the natural bonds, as well as legal obligations growing out of fatherhood, is a situation presenting problems for the future, however fine be the character of the step-father. We merely bespeak common knowledge and human experience.

At the conclusion of the trial, the Judge, with deep feeling, said:

"I would be less than human, or more than human, if I didn't feel very keenly the great responsibility that is on me in reaching a decision, the decision that necessarily affects the happiness of many people, all of them good folks, and of course the decision that necessarily has within it the possible destiny and entire future of the child.

"I have considered the case as carefully as I know how. I spent most of my sleeping hours last night working on it, and I am convinced at this time that the present status of the child should not be disturbed and the custody should remain in the Whatleys and suitable arrangements be made for visits of the Chandlers."

Significant is the expression "all of them good folks," meaning the Whatleys and the Chandlers. Our long and careful study of this record impresses us the same way. Significant also the conclusion that "at this time the present status should not be disturbed."

This proceeding was begun immediately after Jimmie Whatley had lost his wife; the trial was within two weeks. The feeling of supreme tenderness for Bebe was most natural.

We must not overlook the fact, however, that now is the time to determine the status of this child in her home relations for the future years according to the best lights before us. She is entering upon her school life. Swiftly she will approach womanhood. The ties, now so strong on the part of the step-father and his parents, may persist and grow stronger, harder for all to sever.

On the other hand the father's affection and a deep solicitude for the coming of his daughter into a fine womanhood are the surest to endure. In the years to come her presence in her father's home, with all the blessings that come of natural ties and mutual affection, will be hers. This is the natural relation for her.

■ We are fully mindful that conclusions of the trial Judge, earnestly arrived at after hearing and seeing those in-

volved is to be given due weight. Sometimes he is said to have a discretion. If a discretion, in the ordinary sense, it is a judicial, reasonable discretion. Indeed it is a judicial finding upon a most delicate far reaching issue.

We cannot and should not evade responsibility, letting it rest with the trial court. When convinced that he has erred, not so much in his finding of facts, as in the application of sound principles of law in such cases, we must so hold. McLellan v. McLellan, 221 Ala. 363, 129 So. 1; Thomas v. Thomas, 212 Ala. 85, 101 So. 738. We are so convinced.

■ The decree of the court below is reversed and the cause remanded with directions to enter a decree awarding the custody of Bebe Chandler to her father, Jesse Chandler in keeping with the foregoing opinion.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.