721 So.2d 195 (1998)
D.C.
v.
C.O.
2961137.
Court of Civil Appeals of Alabama.
May 15, 1998.
Rehearing Denied June 19, 1998.
Certiorari Denied August 28, 1998.
*196 Leon Garmon, Gadsden, for appellant.
Jack Floyd, Gadsden, for appellee.
Alabama Supreme Court 1971715.
THOMPSON, Judge.
In January 1990, C.O. (the "mother"), gave birth to A.O. (the "child"). The mother and the child lived with the mother's parents, B.O. (the "grandmother") and L.O. Although the mother lived in the home, the grandparents reared the child and were the primary caregivers. In early 1997, when the child was 7 years old, the State Department of Human Resources, on behalf of the mother, brought a paternity and child support action against D.C., alleging that he was the father of the child. D.C. denied paternity. The trial court, after considering the results of D.N.A. testing, found D.C. to be the father and ordered that he pay $174 in monthly child support, commencing in May 1997.
D.C. paid one month's child support and then petitioned for a change in custody in June 1997, when the mother, who had previously been convicted of possession of marijuana, was jailed for a probation violation. D.C. sought and received temporary custody of the child. The grandmother moved to intervene, seeking custody of the child. The trial court granted the grandmother's motion to intervene and held a two-day trial. At the conclusion of the trial, the trial court found the mother unfit because of her admitted drug use, which included the use of marijuana and crack cocaine. The trial court also found the father unfit and awarded custody of the child to the grandmother. Only the father appeals.
The grandmother argues that the trial court found the child dependent and that this is a dependency case. However, the facts of this case do not support her assertion. None of the parties have alleged that the child is dependent. This is a custody dispute. Our supreme court set forth the standard that a trial court must apply to a custody dispute between a parent and nonparents in Ex parte Terry, 494 So.2d 628 (Ala.1986):
"`The prima facie right of a natural parent to the custody of his of her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only be a finding, supported by competent evidence, that the parent seeking custody is guilty of... misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question. Hanlon v. Mooney, 407 So.2d 559 (Ala.1981).'"
Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)). This presumption in favor of the natural parent is not affected by the fact that the child was born out of wedlock. Ex parte D.J., 645 So.2d 303 (Ala.1994).
The trial court, in its order, found the father to be unfit, thus defeating the presumption in his favor afforded by Ex parte Terry. Although the father argues on appeal that the trial court's award of custody to the grandmother was "not in the child's best interests," the true issue in this case is whether the trial court's finding of the father's unfitness is supported by clear and convincing evidence. Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982); Ex parte Terry, supra. We hold that it is, and we affirm.
The trial judge wrote a conscientious and thoughtful order that detailed the basis for his judgment. The portion of the trial *197 court's order that is relevant to this appeal reads as follows:
"The Court finds abundant, clear, convincing, and competent evidence that the father is also unfit and/or unsuited for custody such that the best interest of the child will be served by granting custody to the maternal grandmother. Matters of child custody are subject to the sound discretion of the trial court, and such custody decisions, which are based on ore tenus evidence, will not be reversed on appeal except for abuse [of discretion] or plain error. Moore v. Foye, 646 So.2d 156 (Ala. Civ.App.1994). Therefore, this trial court is not required to articulate each and every factual basis upon which its decision is based.
"The following findings should not be misconstrued as the sole, exclusive factual basis of the Court's decision, but rather as examples of some of the many factors which the Court considers in reaching its decision. The father (through counsel) repeatedly made the argument that the father had absolutely no knowledge (or even a reason to suspect) that the `one night stand' had resulted in the pregnancy and subsequent birth of the child. He claims that he was never personally told of the mother's pregnancy. He claims that he was never contacted by the mother in any manner advising him of the pregnancy or birth. He claims that the very first time that he had any idea whatsoever that he might be the father was when he got the `letter' from DHR in October 1996. The Court simply does not believe that testimony.

"The father admitted that he heard rumors that it was his child. The mother testified that she informed the father of her pregnancy. She invited the father to her mother's house to discuss it. The father came over with his uncle. They talked. The father said, `[W]e'll talk about it and get back with you,' but never did. In another conversation, according to the mother, the father agreed to take a blood test, but never did. He did not attend the birth of the child. He did not pay or offer to pay any of the hospital expenses. The Court chooses to believe the mother's testimony to the effect that the father was notified that the child was his [child]. The father's own admission that he heard rumors that the child was his is sufficient in the Court's opinion to create reasonable suspicion or reason to want to know the truth.

"The father could have himself initiated a paternity action and demanded that the mother and child submit to a DNA test to determine the truth, but he did not want to know the truth. He deliberately chose to ignore the rumors. He made no effort to contact the mother or child for over seven (7) years. The father also said, `I'm not going to do a damn thing until I'm made to.' If the mother had not initiated an action to determine paternity, the father would never have learned the truth. Upon being served with the paternity action, he denied paternity and demanded a DNA test. According to the mother's testimony (which the Court believes), the father said, `the damn child is not mine.' Even after the DNA test results were published, he said, `them tests are wrong.'
"During the first seven (7) years of the child's life, the father made no financial, spiritual, moral, emotional, or physical contribution whatsoever into the child's life. Only because of the child support order did the father make one payment of ONE HUNDRED SEVENTY-FOUR DOLLARS ($174.00). It is no coincidence that the father initiated this custody proceeding and requested that his child support payments cease immediately. A parent (in this case the father) who makes no financial, spiritual, emotional, moral or physical contribution into a child's life for seven (7) years under the guise that he did not know it was his child, has clearly demonstrated to this Court that he is unfit and/or unsuited for custody. Again, the foregoing statements should not be misconstrued as the only basis for the Court's decision, as many other factors were considered in reaching the decision of unfitness."
(Some emphasis supplied.)
The trial court's findings based upon conflicting ore tenus evidence are afforded a *198 presumption of correctness on appeal, and its judgment based on those findings will not be reversed unless it is so unsupported by the evidence as to be plainly and palpably wrong. I.M. v. J.P.F., 668 So.2d 843 (Ala.Civ.App. 1995). The trial judge is in a unique position to view the witnesses and evaluate their credibility as the testimony and other evidence are presented; it is because of this unique ability to evaluate the credibility of witnesses that the trial court's judgment based on the evidence is afforded a presumption of correctness on appeal. Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996); Ex parte Murphy, 670 So.2d 51 (Ala.1995).
The trial court believed the mother's testimony rather than the father's testimony. In addition to admitting that throughout the years he had heard rumors that the child was his daughter, the father never denied that the mother told him that she was pregnant; he testified that he did not remember that conversation:
"THE COURT: Okay. Let me ask you some questions. There was some testimony from [the mother] that, after she realized she was pregnant, that she told you she was pregnant. You don't remember any conversation like that?
"[THE FATHER]: No, sir.
"THE COURT: She related an event where she called you and an uncle to come over to her house. Do you remember any event like that?
"[THE FATHER]: No. I don't remember (inaudible).
"THE COURT: You're not saying that it could not have happened? You just don't have a recollection of it?
"[THE FATHER]: No, sir."
The very basis for the standard set forth in Ex parte Terry is the assumption that the child's natural parent is the one who is most interested in the child's welfare and proper upbringing and is the one who feels the most affection for the child.
"`It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for....
"`... So strong is the presumption that "the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all"; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary law of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare  that the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child.'"
Ex parte Terry, 494 So.2d at 631-32 (emphasis added) (quoting Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982)).
The trial judge specifically found that the father knew and has known throughout this child's life that he is the child's father. The trial court also specifically found that the father filed a petition for custody of this child in order to avoid making child support payments and that it was no coincidence that the father petitioned for custody almost immediately after being ordered to pay child support. The evidence in the record supports those findings of the trial court.
For over seven years, the father acted in a manner that clearly indicates that he had no interest in the welfare or upbringing of this child and that he had no natural affection for the child. The father's actions have refuted the basic premise upon which Ex parte Terry is based: he is not one who in fact feels "the greatest affection for [the child], and take[s] the deepest interest in [the child's] welfare." 494 So.2d at 631. Although the father had no legally enforceable duty to support this child until a court determined his paternity and established his child support obligation, Williams v. State, 504 So.2d 282 (Ala.Civ.App.1986), and State ex rel. T.L.K. v. T.K., 723 So.2d 69 (Ala.Civ.App. 1998), the trial court clearly considered the father's moral duty to provide support for his child. See McCall v. McCall, 596 So.2d 2 (Ala.Civ.App.1991). The father's moral duty to support his child, and his failure to do so, *199 goes to the heart of the issue, i.e., the character and fitness of this man to parent this child. We cannot say that the trial court erred in basing its finding of unfitness, in part, on the father's avoidance of his responsibility for this child. Certainly, a parent who avoids all parental responsibility rebuts the very basis for the Ex parte Terry standard and should not be afforded the benefit of that standard. The father is now married and has two sons and a stepson. The family of five lives in a two-bedroom home. When she is at her father's house, the child sleeps in a bunk bed in the boys' room, on a foldout couch in the living room, or in the father's bed while the father and his wife sleep on the foldout couch.
The child has lived her entire life with the grandparents. The grandmother is the primary caretaker, and the grandfather participates actively in her education. The child testified in chambers regarding the living conditions at her father's home and she expressed a preference to live with her grandparents.
We cannot say that the trial court erred in finding the father unfit and awarding custody to the grandparents. We affirm.
AFFIRMED.
ROBERTSON, P.J., concurs.
MONROE, J., concurs specially.
YATES, J., concurs in the result.
CRAWLEY, J. dissents.
MONROE, Judge, concurring specially.
I agree with Judge Thompson's opinion; the father's failure to care for the child for seven years renders him unfit to be the child's parent now. In addition to the reasons Judge Thompson sets forth for affirming the trial court's finding that the father is unfit, I believe that the father legally abandoned the child. Therefore, he is not entitled to benefit from the standard established in Ex parte Terry, 494 So.2d 628 (Ala. 1986), which favors giving custody of a child to the natural parent. On the contrary, I believe that the presumption in this case is that the father is unable or unwilling to act as a parent.
The Legislature has determined that when a parent has abandoned his child, and the abandonment continues for a period of the six months preceding the filing of the petition to terminate parental rights, there is a rebuttable presumption that the parent is unable or unwilling to act as a parent. § 26-18-7(c), Ala.Code 1975. "Abandonment" is defined as follows:
"(1) Abandonment. A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 26-18-3(1), Ala.Code 1975.
The father admitted that he had heard rumors that the child was his. The trial court rejected the father's testimony that he had no idea he had a child until DHR sought child support payments, saying that it "simply does not believe that testimony." Instead, the court believed the mother's testimony that the father was aware the mother was pregnant with his child and had at least two conversations with the mother regarding the child during the mother's pregnancy. The father never got a blood test to determine paternity; he did not attend the birth of the child; and he made no offer or attempt to pay the expenses incurred from the birth of the child.
Even without the mother's testimony, we know that the father was aware of rumors that he most likely had a child, yet he did nothing to confirm or deny the rumors or suspicion. He made no attempt to develop a relationship with the child; he gave no love or support to the child; he failed to claim parental rights; and he failed to perform parental duties.
The father abandoned this child eight years ago, and there is no evidence that he did so with good cause or excuse. He gave up the rights of a natural parent years ago. The trial court's judgment finding the natural *200 father unfit and awarding custody of the child to the grandparents is correct.
CRAWLEY, Judge, dissenting.
I must respectfully dissent. I would reverse the judgment of the trial court because the evidence does not support its finding of unfitness.
Ex parte Terry sets out the standard the trial court must use in deciding a custody dispute between a parent and nonparents:
"`The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by [clear and convincing][1]evidence, that the parent seeking custody is guilty of ... misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"
Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)). That the father is seeking custody of a child born out of wedlock does not affect the parental presumption. Ex parte D.J., 645 So.2d 303, 306 (Ala.1994).
The trial court's order states that it found from clear and convincing evidence that the father was unfit. Although it indicates that its decision was based on several other unspecified factors, the trial court dedicates two pages of its order to stating that it does not believe that the father did not know that the child was his and that the father had made no effort to contribute to the "financial, spiritual, emotional, moral or physical [well-being of the child] under the guise that he did not know [the child was his]." I cannot agree that the father's failure to pursue paternity testing on his own or his lack of contribution to the "financial, spiritual, emotional, moral or physical [well-being of the child]" makes him unfit. In fact, the basis of trial court's decision appears to run counter to our supreme court's opinion in Ex parte D.J., 645 So.2d 303, 306 (Ala.1994), in which the supreme court clearly stated that the parental presumption of Ex parte Terry had long been extended to fathers of illegitimate children. See Lewis v. Crowell, 210 Ala. 199, 200, 97 So. 691, 692 (1923), and Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955).
The supreme court has held:
"[I]n a custody contest between a nonparent and one who has been adjudicated the father of a child born out of wedlock, the father is entitled to the presumption that the child's best interests will best be served by an award of custody to him, subject to the absence of a finding that he is unfit...."
Ex parte D.J., 645 So.2d at 306 (emphasis added). The father in this case had no right to the custody of this child, and consequently, no responsibility for her, until paternity was established. Only after a determination of paternity had been made was the father subjected to the "obligations for the care, maintenance, and education of the child [such] as are imposed upon fathers of legitimate children." Keener v. State, 347 So.2d 398, 401 (Ala.1977); see also Ex parte University of South Alabama, 541 So.2d 535, 540 (Ala. 1989) (Maddox, J., dissenting).
The majority states that the parental presumption set out in Ex parte Terry does not apply to the father because he avoided his responsibility for his child. Under the law, the father had no legal responsibility for the child, so he could not have "avoided" that responsibility. Judge Thompson, in State ex rel. T.L.K. v. T.K., 723 So.2d 69 (Ala.Civ.App. 1998) (quoting Ex parte State of California, *201 669 So.2d 884, 885 (Ala.1995)), stated: "No duty of support arises from a mere presumption of paternity; `paternity must be established before a court determines whether child support is owed.'" If no duty arises from a statutory presumption of parenthood, surely no duty arises from a rumor of parenthood. As our supreme court has clearly stated, paternity must be established. See Ex parte State of California, 669 So.2d 884, 885 (Ala.1995). Nothing in Ex parte Terry or Ex parte D.J. carves out an exception to the parental presumption. The Ex parte Terry standard applies to the father of a child born out of wedlock. In fact, our supreme court has stated:
"Moreover, no reason appears why a natural father [of a child born out of wedlock] should not be presumed susceptible of the same paternal affection and nurturing tendencies as fathers of children born within the bonds of marriage. Indeed, the application of the parental presumption in such cases promotes the sound policy of encouraging fathers to fulfill their paternal roles."
Ex parte D.J., 645 So.2d at 306 (emphasis added). "Susceptible" is defined as "capable of submitting to an action" and "open, subject, or unresistant to some stimulus, influence, or agency." Merriam Webster's Collegiate Dictionary 1187 (10th ed.1997). In my opinion, it makes little difference that the father did not show an interest in a child that was not yet judicially determined to be his; he is entitled to the presumption that, as a father who has recently been adjudicated the father of a child, he will act in accordance with the feelings evoked by his new-found fatherhood.
Judge Monroe, in his special concurrence, makes an argument similar to the majority's; that is, he states that the father forfeited his rights to the child because he abandoned the child. To abandon a child, a parent must have a right and an obligation to that child. The father was not the child's legal parent until he was adjudicated the father, and, before the adjudication, he was not subject to the "obligations for the care, maintenance, and education of the child [such] as are imposed upon fathers of legitimate children." Keener, 347 So.2d at 401; see also Ex parte University of South Alabama, 541 So.2d at 540 (Maddox, J., dissenting).
As for the majority's argument that the father is not entitled to the parental presumption because he has avoided "his moral duty to provide support for his child," 721 So.2d at 198, it fails because "`[i]n the absence of a legal duty, the breach of a moral duty does not suffice to invest ... liability.'" Hathcock v. Hathcock, 685 So.2d 736, 738 (Ala.Civ.App.1996) (quoting Handley v. Richards, 518 So.2d 682, 686 (Ala.1987) (Maddox, J., concurring specially)). Certainly, parents have certain moral obligations to their children. See Hathcock, 685 So.2d at 738. However, all "moral obligations ... are not legally enforceable duties." Id. "The law does not mirror all prevailing moral standards," id., and this court cannot enforce every moral obligation, because it is bound by the law.
The true issue in this case is whether the trial court's finding of unfitness is supported by clear and convincing evidence, as required by Ex parte Terry. See Ex parte Terry, 494 So.2d at 632; Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982).
"`Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of the evidence and evidence probative beyond a reasonable doubt.' The standard has been explained as that evidence which convinces the trier of fact that a proposition is `highly probable,' as distinguished from `more probable than not.'
"`Clear and convincing proof is not necessarily undisputed proof.' `The clear ... and convincing standard' is met when the court is `... clearly convinced of the affirmative of the proposition to be proved.' This does not mean that there may not be `contrary evidence.' `"[C]onvincing" evidence by definition requires a weighing of the evidence.'"
D.D.P. v. State, 595 So.2d 528, 538 (Ala.Crim. App.1991) (citations omitted). Although I recognize that the trial court's decision is presumed correct under the ore tenus standard and cannot be reversed unless it is so unsupported by the evidence as to be plainly *202 and palpably wrong, Godwin v. Bogart, 674 So.2d 606, 610 (Ala.Civ.App.1995), I do not believe the trial court's decision is supported by the appropriate quantum of evidence. Other than the trial court's obvious determination that the father shirked a responsibility he did not have, I can find no basis for a finding of unfitness.
The mother testified that the child was conceived of a one-time sexual encounter. According to the mother, she and the father "dated" for six to eight weeks in 1989 before she learned that she was pregnant. She testified that she told the father of the pregnancy immediately, but she says that he denied paternity. She further testified that she knows that the father drinks alcohol and smokes marijuana. However, on further examination, she admitted that she had seen him smoke marijuana only a "couple of times" since they had stopped "dating." She also testified that the child told her that she saw the father "roll[] up a cigarette."
The grandmother testified that the child had indicated to her that she did not want to live with her father. According to the grandmother, the child complained about the six-foot fence around the father's house and told her that at the father's home she had to sleep on a beanbag chair. The grandmother recounted an incident where the child came home with a note to the grandmother tucked into her shoe. According to the grandmother, the child told her that she had to sneak the note out of the father's house because the father's wife, A.C., took another note she was writing away from her. The grandmother stated that the child could not be happy in the father's home.
The father testified that he is now married and has two sons by his wife. He said that their family also includes his wife's son by another man. He testified that he and his wife want to incorporate the child into their family; she would be the only daughter. The father denied that the mother had ever told him before the paternity action was filed that the child was his. He did admit that he had heard rumors that he was the father, but he said that he did nothing to determine if the rumors were true. According to him, the encounter with the mother was a one-night stand. The father candidly admitted that he drinks beer on occasion, sometimes in the evening when he arrives home from work and sometimes on weekends. He denied that he presently smokes marijuana; however, he admitted that in the past, until about five years before, he did smoke marijuana. He testified that the child did not seem miserable while at his home. He testified that the child sometimes slept in the top bunk bed in the boys' room and that she sometimes slept on the fold-out couch. He further testified that he and his wife sometimes gave up their bed for her to sleep in. He said that he was considering adding a room for the child or possibly buying a larger home.
The father's wife testified that two of her children had suffered from lead poisoning. According to her, the lead poisoning was discovered during a routine health screening. The wife testified that they discovered that the house they live in had been painted with lead-based paint and that the kitchen had lead pipes. She further testified that she and the father have done extensive remodeling and that the remodeling of the inside of the house had been completed. However, she admitted that the repainting of the exterior of the house had not yet been completed. She testified that the house has two bedrooms. According to her, her children sleep in one bedroom and she and the father sleep in the other. However, she testified that she and the father had allowed the child to sleep in their room while they slept on a fold-out couch. When questioned about the child's report that she had to sleep on a beanbag chair, the father's wife testified that the child had asked to sleep on that chair one night. She further testified that neither she nor the father smokes marijuana. She also testified that the father does drink beer. She denied that the father has ever hit her or abused her.
K.E.H., a neighbor of the grandmother, testified that her daughter and the child were friends. The neighbor testified that she had picked up and dropped off the child at the father's home while he had custody. According to her, the child had indicated that she wanted to go back to her grandmother's house. She also stated that the child had *203 said she was planning to run away from her father's house.
The mother's common-law husband, M.C., testified that he worked at a Jack's restaurant in 1993 or 1994 with the father's wife. According to him, the father's wife came to work one day with a black eye, with a "busted lip," and with her arm in a sling. He stated that she told him the father had beat her up.
The child testified in chambers. When asked by the court whether she would rather stay with her grandparents, she answered yes. The court asked if her father drank every night, and she answered no. She also told the court no when it asked her if the father ever got drunk or passed out.
I have reviewed the testimony, but I have found no clear and convincing evidence that the father is unfit. That is, I found no "evidence [that] convinces [me] that [the father's unfitness] is `highly probable,' as distinguished from `more probable than not.'" D.D.P., 595 So.2d at 538. At worst, the facts establish that the father might have physically assaulted his wife one time three or four years ago, that he drinks beer after work and on weekends, and that he may, according to the mother, have smoked marijuana "a couple of times" in the past five years. The fact that the father's two sons suffered from lead poisoning does not indicate a lack of care by the father and his wife; in fact, the father and his wife both testified that they took on, and have nearly completed, the task of remodeling to remove lead contaminates from the home. The father's home is small, but he and his wife testified that they can make arrangements for the child to have a place to sleep. The father even testified that he would consider adding another room or purchasing a larger house. None of the evidence supports a finding that the father "`is guilty of ... misconduct or neglect to a degree which renders [him] an unfit and improper person to be entrusted with the care and upbringing of the child.'" Ex parte Terry, 494 So.2d at 632 (citation omitted).
In light of the parental presumption explained in Ex parte Terry, and because the trial court's finding of unfitness is not supported by clear and convincing evidence, I would reverse the trial court's judgment.
NOTES
[1] I have replaced the word "competent," which actually appears in the text quoted from Ex parte Terry, with the words "clear and convincing" because Ex parte Berryhill, 410 So.2d 416, 417 (Ala. 1982), upon which the Ex parte Terry decision is based, requires clear and convincing evidence of the unfitness of a parent before the parental presumption may be overcome. See also Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939). In Ex parte Terry, the supreme court expressly stated that "[t]he standard to be applied in this case is that applied by this Court in Ex parte Berryhill." Ex parte Terry, 494 So.2d at 632.