891 So.2d 346 (2004)
K.C.
v.
D.C.
2021205.
Court of Civil Appeals of Alabama.
April 16, 2004.
Samuel T. Russell, Huntsville, for appellant.
Thomas K. Jefferson, Huntsville, for appellee.
CRAWLEY, Judge.
In December 1996, C.M. ("the mother") gave birth to A.C. ("the child"). The mother was unmarried, but K.C. ("the father"), her boyfriend, was present at the child's birth and is listed as the child's father on the birth certificate. The mother, the father, and the child lived together for some period of time following the *347 child's birth; however, the exact amount of time is in dispute. According to the mother and the father, when the mother and the father parted ways sometime before 1998, the mother took the child with her. She acquired housing located very near her mother, D.C. ("the grandmother"). The grandmother testified that the mother and the child moved in with the grandmother shortly after the child's birth and that they lived with her for one year before the mother found her own residence, which is located near the grandmother's residence.
The grandmother is married to E.C. ("the stepgrandfather"), and the two of them helped the mother care for the child on a regular basis because the mother was employed at a job requiring her to work from 4:00 p.m. to 12:00 a.m. When the child was approximately 18 months old, the stepgrandfather had occasion to check on the child one day at the mother's residence. He alleges that he found the child in a deplorable condition, in an unchanged diaper and with dried excrement on his severely red and sore bottom. At this point, the stepgrandfather and the grandmother (hereinafter sometimes collectively referred to as "the grandparents") decided that the mother was not able to care for the child on her own.
Once the grandparents decided that the mother was not fit to rear the child, they confronted the mother. The stepgrandfather testified that the mother admitted she could not handle rearing the child and that she requested that the grandparents assume that task. The stepgrandfather testified that he explained the situation facing the family to the father, including reporting to him the deplorable condition the child was in on the day the stepgrandfather checked on him. Although all parties agree that a discussion regarding the child occurred in 1998, the specific details concerning the discussion  exactly what was said and by whom  are sharply disputed. The stepgrandfather said that he told the father that the father had rights and that he should see an attorney so that he could get custody from the mother. According to the stepgrandfather, the father later reported to him that he had seen an attorney who had reportedly told him it was impossible to take a child away from its mother. According to the stepgrandfather, the father acquiesced in the child being reared by the grandparents provided that he was allowed to visit with the child. The grandmother's recollection was similar to the stepgrandfather's; she stated that the father had asked her to rear the child because he could not.
The parties agree that the father, apparently pursuant to an agreement with the mother, which was continued by the grandparents, paid day-care expenses and, as the child grew older, school tuition. Whether the father paid those expenses is not disputed, although he often made late payments and, at times, borrowed the money to do so. In addition, the father visited the child on a fairly regular basis. He has taken the child on a few extended visitations, and, at least under one view of the testimony, he sees the child on a regular basis, including some school nights. The stepgrandfather testified that the father was reliable when requested to "help" and that the father had "done a good job with what [the grandparents] asked him to do."
The father was 30 years old at the time of trial. He had been pursuing, but had not completed in the 12 years before trial, a college degree. He has had several jobs over the last several years before trial, and, at the time of trial, he was "cooking for the elderly." He has not always had a car, and, at times, he has not had a residence. *348 At the time of trial, he lived with a girlfriend.
In September 2002, the grandmother filed a petition alleging that the child was dependent and seeking custody of the child. The father answered the petition, denying its allegations and admitting paternity. The parties attempted to settle this case before it was called for trial. Upon listening to counsel report the parties' proposed agreement, which involved a joint-custody arrangement between the grandmother and the father, the trial court announced that it could not accept the agreement because the case was a dependency case and it could not award joint custody in a dependency case. The case then proceeded to trial, after which the trial court entered a judgment containing no dependency finding,[1] but finding that the father had voluntarily relinquished custody of the child and awarding custody of the child to the grandparents. The father appeals.
The father argues that the trial court erred in awarding custody to the grandparents because, he says, the trial court did not have sufficient evidence[2] to find that he voluntarily relinquished custody of the child. The father also argues that the trial court could not have found that he voluntarily relinquished custody of the child to the grandparents because, he argues, the grandparents had agreed to care for the child during necessitous times. See Ex parte Couch, 521 So.2d 987 (Ala.1988), D.P.M. v. D.B., 669 So.2d 191 (Ala.Civ.App.1995), M.D.K. v. V.M., 647 So.2d 764 (Ala.Civ.App.1994), and Curl v. Curl, 526 So.2d 26 (Ala.Civ.App.1988).
Ex parte Terry, 494 So.2d 628 (Ala.1986), sets out the standard a trial court must use in deciding a custody dispute between a parent and a nonparent:
"`The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by [clear and convincing[3]] evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper *349 person to be entrusted with the care and upbringing of the child in question.'"
Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)) (emphasis omitted; emphasis added).
When a trial court makes a custody determination based on oral testimony, as in the present case, this court presumes that it is correct. See Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). This court is not permitted to question such a determination unless the trial court's determination is so unsupported by the evidence that we conclude that it is plainly and palpably wrong. Ex parte Fann, 810 So.2d at 633. Our limited review is based on the fact that, as an appellate court, we do not observe the witnesses and have no way to assess their credibility. Id. Our supreme court has noted that the "opportunity to observe witnesses is especially important in child-custody cases." Id.
To decide the issues in the present case, we must consider whether, under the principles expressed in Ex parte Terry, the trial court could properly award custody of the child to the grandparents. That is, did the grandparents prove that the father voluntarily relinquished custody to them so as to remove from the father the presumption that the child's custody should be awarded to him. In addition, we must consider whether the "necessitous times" principle expressed in cases like Ex parte Couch, 521 So.2d 987, D.P.M. v. D.B., 669 So.2d 191, M.D.K. v. V.M., 647 So.2d 764, and Curl v. Curl, 526 So.2d 26, applies so as to prevent the grandparents from arguing that the father's conduct amounted to a voluntary relinquishment. These two issues are closely related.
The grandparents approached the father in 1998, alerted him to facts indicating that the mother was possibly unfit, and told him that the mother had requested that the grandparents rear the child. Under Ex parte Terry, the father had the superior right to custody, had he chosen to act upon it. Instead, he chose to allow the grandparents to take on the role of parents and to rear the child. The father's actions and statements, as recalled by the grandparents, belie an intent to fulfill his parental role after the mother's choice to abdicate her parental responsibility to the grandparents. Certainly, the father has acted with some degree of responsibility by visiting with the child and by paying some expenses, including day-care expenses and school tuition. However, voluntary relinquishment is not the equivalent of abandonment, and a finding of voluntarily relinquishment need not be supported by evidence that a parent has neglected to visit with or provide for his child.
The father argues that he should not be penalized with a finding of voluntary relinquishment when he and the mother simply relied upon the aid of the grandparents in providing care for the child during necessitous times. As this court stated in M.D.K. v. V.M., 647 So.2d at 765:
"This court and our Supreme Court have encouraged custodial arrangements during necessitous times. See, e.g., Ex parte Couch, 521 So.2d 987 (Ala.1988), and Curl v. Curl, 526 So.2d 26 (Ala.Civ.App.1988). This same policy concern is applicable to similar situations between grandparents and parents. In this case, the mother evidenced her care for her child by enlisting the aid of [the grandparents] to care for the child during difficult times. To allow a grandparent to argue that this set of facts supports a finding that a parent voluntarily relinquished custody of a child, would promote family discord and would discourage parents from seeking assistance *350 from grandparents to insure that the children have adequate care."
The opinion in M.D.K. contains virtually no information, other than a comment that the child had lived with the maternal grandparents for a "substantial period of time," that would shed light on exactly what "set of facts" that grandparents are prohibited from arguing amount to voluntary relinquishment. M.D.K., 647 So.2d at 765.
One year later, this court considered again whether a mother's enlisting the aid of a grandparent to care for a child during necessitous times amounted to voluntary relinquishment. See D.P.M. v. D.B., 669 So.2d 191. The mother in D.P.M. was incarcerated in a prison in Texas when she gave birth to her child. D.P.M., 669 So.2d at 192. She placed the child in the custody of a friend, who then took the child to the child's maternal grandmother in Alabama at the mother's request. Id. The mother executed a document entitled "Temporary Custody Order" that appointed the grandmother the guardian for the child. 669 So.2d at 192-93. The mother, once she completed her prison sentence in Texas, was transferred to a prison in Arizona; she was released on parole from the Arizona penal system in 1993. 669 So.2d at 193. The mother continued to reside in Arizona after she was released from prison. Id. In 1994, the maternal grandmother took the child to Arizona to see the mother. Id. The grandmother returned to Alabama without the child, but she instituted custody proceedings a few months later. Id. The trial court awarded custody of the child to the grandmother; the mother appealed. 669 So.2d at 192.
This court considered whether the trial court could have properly determined that the mother, by requesting the aid of the maternal grandmother while the mother was incarcerated, had voluntarily relinquished her right to custody. 669 So.2d at 194. After acknowledging that two earlier cases had held that a parent who made arrangements for another to assume custody of his or her child during a period of incarceration had voluntarily relinquished custody, this court determined that the holdings in those two cases were "somewhat doubtful ... after the decision of the Alabama Supreme Court in Ex parte D.J., 645 So.2d 303 [(Ala.1994)]." D.P.M., 669 So.2d at 194 (citing J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App.1991), and Dunlap v. Jeffcoat, 352 So.2d 1380 (Ala.Civ.App.1977)). In our discussion, this court noted that voluntary relinquishment had been defined in Ex parte D.J. as the "`voluntary and intentional surrender or relinquishment of a known right'" and that our supreme court had concluded that one could not give up a right that did not exist. D.P.M., 669 So.2d at 194 (quoting Ex parte D.J., 645 So.2d at 306). Reasoning that the mother in D.P.M. could not have had the right to the custody of her child while incarcerated, we determined that the mother's actions in placing the child in the maternal grandmother's custody during the mother's incarceration could not amount to voluntary relinquishment. D.P.M., 669 So.2d at 194. However, we concluded that the trial court could consider whether "all of the mother's conduct toward the child, especially her conduct from May 1993, when she was released on parole, to the time of the hearing," could amount to voluntary relinquishment. 669 So.2d at 195.
Certainly, the policy of encouraging extended families to work together to provide for the safety and welfare of children is a sound one. As noted above in the quotation from M.D.K., both this court and our supreme court have, in various forms, acknowledged and promoted this policy. See, e.g., Ex parte Couch, 521 So.2d at 990 *351 (holding that voluntary agreements as to custody arrangements are not viewed as a change to the original custody judgment and encouraging divorced parents to make agreements regarding custodial arrangements that best suit the interests of the children in necessitous times); Curl v. Curl, 526 So.2d at 28 (same); P.A.T. v. K.T.G., 749 So.2d 454, 458 (Ala.Civ.App.1999) (same); A.L. v. S.J., 827 So.2d 828, 836-37 (Ala.Civ.App.2002) (holding that a parent's agreement to a pendente lite custody judgment does not amount to a voluntary relinquishment of the parent's right to custody); D.P.M., 669 So.2d at 194 (holding that a parent's agreement placing custody of a child with another person during the parent's incarceration does not amount to voluntary relinquishment); and M.D.K., 647 So.2d at 765 (holding that enlisting the aid of grandparents to care for a child during necessitous times does not amount to a voluntary relinquishment). However, as the remand instructions in D.P.M. indicate, voluntary relinquishment can be found when an agreement for the care of a child during necessitous times should have ended because the parent has the ability to resume care of the child. D.P.M., 669 So.2d at 195.
Although we continue to believe that temporary custody agreements between parents and third parties during necessitous times do not, alone, result in voluntary relinquishment, a trial court facing the issue must determine whether the facts of the particular case support a conclusion that the parent voluntarily relinquished custody of the child or whether the parent's actions were instead "enlisting the aid" of another during necessitous times. In the present case, the grandparents, according to their testimony, made it very clear to the father that their intention would not "be just to babysit" anymore and that they intended to make any custody arrangement whereby they would care for the child permanent. The child was in the care of the grandparents for four years before they sought a judicial determination of custody. During that time, the father failed to take on his parental role and instead opted for a role requiring less responsibility. The trial court had ample evidence to support its conclusion that the father voluntarily relinquished to the grandparents his custody of the child and that this situation was not one in which the father had merely enlisted the aid of the grandparents during necessitous times. Because the trial court heard all the witnesses, observed their demeanor, and resolved the conflicts in the evidence in the grandparents' favor, as it was entitled to do, we cannot disturb its findings. See Ex parte Fann, 810 So.2d at 633.
AFFIRMED.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
NOTES
[1] Neither party argues that this case is governed by the dependency statute, Ala.Code 1975, § 12-15-1 et seq., and we conclude that the case is more in the nature of a custody case. See C.P. v. M.K., 667 So.2d 1357, 1358 (Ala.Civ.App.1994); see also Jones v. Webb, 524 So.2d 374, 375 (Ala.Civ.App.1988). Therefore, this case is properly reviewed under the law relating to the award of custody to third parties. See, e.g., Ex parte Terry, 494 So.2d 628 (Ala.1986) (explaining the application of the parental presumption), and Ex parte D.J., 645 So.2d 303 (Ala.1994) (deciding that the parental presumption applied to the adjudicated father of a child born out of wedlock).
[2] The trial court applied "the clear and convincing evidence" standard to the grandparents' voluntary-relinquishment claim. Neither party challenges the application of that standard, and we do not address that issue.
[3] We have replaced the word "competent," which actually appears in the text quoted from Ex parte Terry, with the words "clear and convincing" because Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982), upon which the Ex parte Terry decision is based, requires clear and convincing evidence of the unfitness of a parent before the parental presumption may be overcome. See also Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939). In Ex parte Terry, the supreme court expressly stated that "[t]he standard to be applied in this case is that applied by this Court in Ex parte Berryhill." Ex parte Terry, 494 So.2d at 632.