995 So.2d 893 (2008)
R.S.
v.
R.G. and M.G.
2061162.
Court of Civil Appeals of Alabama.
May 23, 2008.
*894 Deborah L. Long, Madison, for appellant.
Allen R. Stoner, Decatur, for appellees.
THOMPSON, Presiding Judge.
R.S. ("the father") appeals from the termination of his parental rights to Z.I.S. ("the child"). We affirm.
On October 21, 2005, R.G. and M.G., the child's maternal grandparents (hereinafter collectively referred to as "the maternal grandparents"), filed an emergency petition alleging that the child was dependent and seeking temporary custody of the child. In their petition, the maternal grandparents alleged that the child, who was four years old at the time the petition was filed, had lived with them since July 2005 when D.S., the child's mother ("the mother"), and the child moved from Texas to Alabama. The mother died shortly after moving with the child to Alabama. The maternal grandparents alleged in their dependency petition that the father had not supported the child financially or emotionally, that he had maintained minimal contact with the child, and that he "had a history of alcohol and drug abuse for which he has not taken consistent actions to treat." Following a hearing on the maternal grandparents' petition, the trial court entered an order on August 29, 2006, finding the child dependent and awarding the maternal grandparents temporary custody of the child.[1]
On May 1, 2007, the maternal grandparents filed a petition to terminate the father's parental rights to the child, alleging that the father had voluntarily and intentionally relinquished custody of the child, that the father had failed to provide for the material needs of the child, that the father had failed to maintain regular visitation with the child, that the father had failed to maintain regular contact or communication with the child, and that the father had failed to otherwise adjust his circumstances to meet the needs of the child.
Following an ore tenus hearing on August 16, 2007, the trial court entered a detailed judgment on August 29, 2007, terminating the father's parental rights. In its order, the trial court made the following pertinent findings of fact:
"The Court finds from clear and convincing evidence, competent, material and relevant in nature that [the child] is a dependent child whose parent, [the father], is unable or unwilling to discharge his responsibilities to and for the child and that the conduct or condition of the [father] is such as to render him unable or unwilling to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future.
"In determining that [the father] is unable or unwilling to discharge his responsibility to and for the child, the Court has considered the following:
"1. The father has abandoned the child as defined in § 26-18-3 and § 26-18-7, Code of Alabama, 1975. There has been a voluntary and intentional relinquishment of the custody of the child by his father, or a withholding from the *895 child, without good cause or excuse, by the father, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or a failure to perform the duties of a parent. This abandonment has continued for a period of more than four months next preceding the filing of this petition. The child and his sick mother moved to the [maternal grandparents'] home in July 2005. At that time, the mother and father were still married although there were frequent lengthy periods of separation during their marriage. When the child's mother died on October 19, 2005, [the maternal grandparents] did not know how to contact [the child's] father and filed a dependency petition on October 21, 2005 (JU-2005-312.01). The father appeared at an initial appearance hearing and was served with process and appointed counsel. Despite notice of court dates being sent to him, [the father] did not appear at the dependency hearing or later for dispositional hearing to try to regain custody of his child. No motions were filed by him to regain custody of his child. He has appeared once before this final termination hearing in the five other court settings that we have had regarding his child. [The father] has presented nothing to the Court to rebut the presumption that he has intentionally abandoned his child.
"....
"The Court also considered the following:
"1. [The father] has failed to provide for the material needs of [the child] or to pay a reasonable portion of his support where he is able to do so. Testimony is disputed concerning whether [the father] offered to give the [maternal grandparents] money for [the child] but the bottom line is that he has not paid anything. According to the evidence, [the father] earned approximately $35,000 per year for the last two years and had a company vehicle and gas card. He has lived with various friends and family. He testified that he set up a bank account for [the child] but it is not in the child's name and contains about six hundred dollars. The [maternal grandparents] have been caring for and maintaining [the child] for over two years.
"2. [The father] has failed to maintain regular visits with [the child]. In the order issued December 16, 2005, he was granted monthly visitation. The Court is cognizant that [the father] must travel eighteen hours each way to visit his son or attend court and that he works and can not take off a great deal of time. But according to testimony, [the father] has visited his son three times since October 2005. [The child's] mother died in October 2005 after a lengthy and debilitating illness. [The father] was separated from [the child's] mother. According to the testimony of his current wife, he was dating her during this time. Following the death of [the child's] mother, it appears that [the father] did nothing to help his son. The evidence reflects that the mother and her parents are the only stable family the child has ever had. This child has gone through having his mother die when he was not yet five years of age and his father visited with him only three times since his mother's death.
"3. [The father] has failed to maintain consistent contact or communication with the child. The last contact that he had with [the child] or the [maternal grandparents] was by telephone in April 2007. He could not tell the Court the name of his child's school last year. He did not tell the [maternal grandparents] *896 or [the child] that he had gotten married and they are expecting a child. His telephone calls have been sporadic and infrequent. The [maternal grandparents] have not moved or changed their telephone number since [the child] has lived with them.
"4. There has been a lack of effort on the part of [the father] to adjust his circumstances to meet the needs of his child. He testified that he considered moving here but stayed in Texas because of his job with his aunt's former husband's company. Testimony revealed that he has not established stable housing for many years. He has lived in places owned by his family, his former uncle or with friends for quite some time. He and his pregnant wife plan to move into his former uncle's fiancee's home that the former uncle owns but now lives in the former uncle's home with his children and extended family. There was no evidence indicating that his current housing would be sufficient to meet his child's needs. He did not testify about any arrangements that he had made to enroll [the child] in school.
"The Court further finds that there are no viable alternatives to termination of parental rights of the father. [The child] lives with his maternal grandparents who have provided him with a safe, stable and loving home. The evidence reflects that he did not live with his father for frequent periods of his life when his parents were often separated. [The father] has not exercised visitation when he was given the opportunity to do so and failed to maintain regular contact with his son. Unfortunately, the Court has no information regarding his father's home since he did not live at the address provided for the home study and is living with his former uncle temporarily at this time and has a history of unstable housing. [The father] has another son that he has voluntarily abandoned. The families of the child's mother and father have no interaction. The Court does not find that it would be in the best interest of the child to search for viable alternatives to termination based upon the father's unsettled history especially in light of the child's untimely loss of his mother."
The father timely appealed.
The evidence presented to the trial court reveals the following pertinent facts. The father and the mother married in March 1998. The child was born on November 16, 2000, in Texas. The record indicates that the mother and the father separated at least two times during their marriage. In the summer of 2003, the mother and the child left Texas and moved to Alabama to live with the maternal grandparents; the father stayed in Texas. In November 2003, the mother, who had been diagnosed with Raynaud's disease and lupus, and the child moved back to Texas in order for the mother to receive necessary medical treatment from her doctors in Texas. In July 2005, the mother and the child moved back to Alabama to live with the maternal grandparents. The mother died on October 19, 2005. The mother and the father were still married at the time of the mother's death.
The father, who was 29 years old at the time of the final hearing in this matter, testified that he was not immediately notified of the mother's death. The father stated that he last spoke to the mother on the telephone in August or September 2005. The father testified that he learned of the mother's death one month after she had died.
The father testified that after the mother died in October 2005, he visited the child in Alabama on several occasions. The father first visited the child briefly on *897 December 16, 2005, while in Alabama for a hearing on the maternal grandparents' dependency petition. The father testified that after he took the child to a McDonald's fast-food restaurant for a short visit on that date, he returned to Texas. The father stated that he visited the child a second time in February 2006 for two or three days and a third time in December 2006 for five days.
In addition to those visits with the child, the father estimated that he had appeared for hearings in Alabama five times and that he had visited with the child briefly on those occasions. The father could not recall at the final hearing the specific dates of the hearings at which he had appeared and had visited the child. When later asked by the trial court if "it would be right that you have come before me one time before today," the father answered "yeah, I think so." The father testified that he had not visited the child in 2007.
The father explained that he had not visited the child more frequently because it was an 18-hour drive from his home in Corpus Christi, Texas, to the maternal grandparents' home in Alabama. The father further explained that he only received one week of vacation from his employer each year. On cross-examination, the father testified that he could take a longer vacation if the child lived in Texas.
The father testified at length regarding his successful and unsuccessful attempts to contact the child by telephone. The father testified that he always initiated telephone contact with the child. The father testified that in January 2007 he talked to the child on the telephone once every few days. The father further testified that he spoke with the child on the telephone once or twice a week in the first part of February 2007. However, he explained that because of his busy work schedule and social obligations, he had not talked to the child for some time. The father stated that he left messages for the child in February and early March, but those messages were not answered. The father testified that the last time he called the child and left a message was in June 2007. According to the father, the child did not return his telephone call. The father testified that the last time he spoke to the child was in February 2007.
The father testified that he did not send the child cards or letters because he "call[ed] him all the time." The father acknowledged that he did not send the child cards or letters when he could not contact the child on the telephone. Likewise, the father acknowledged that he had made no attempts write the maternal grandparents regarding his unreturned messages for the child or contacted his attorney to investigate the matter. The father testified that he did not send the child gifts on his birthday in November because he took the child shopping for presents when he visited in December.
The father had remarried in February 2007. At the time of the final hearing, the father's wife was pregnant with their first child. The father testified that he had discussed with his wife the possibility of moving to Alabama, but the opportunity to run his family's business in the future prevented him from moving. The father further testified that he had decided not to move because he had no family, other than the child, that lived in Alabama.
The record indicates that the father changed residences at least twice during the 21 months preceding the final hearing in this matter. At the time of the final hearing, the father and his wife lived with the father's uncle and the uncle's three children in the uncle's girlfriend's house. The father testified that his uncle and the uncle's girlfriend planned to move into a new house and that he intended to purchase *898 the uncle's girlfriend's house once construction on the uncle's new house was completed.
The father maintains a full-time job working for his family's business. The father estimated that he earned $35,000 in gross income per year in 2005 and 2006. The father testified that he drives a vehicle owned by the business and that he has a credit card issued to the business with which he purchases gasoline for the vehicle. The father explained that he expected to run the family business in a year or two and estimated that his yearly income would increase to approximately $70,000 at that time.
It is undisputed that the father has never paid child support to the maternal grandparents. The father testified that he did not pay child support because the maternal grandparents never asked him to do so. According to the father, the maternal grandparents told him that they did not need his money. The father acknowledged that he could have afforded to save money each month for the child. The father testified that his family's business maintained an account that had a balance of $600 that he had saved for the child. The father testified that the account was not in the child's name but that he had saved the money to use in case of emergencies regarding the child. The father testified that he would be willing to pay child support if ordered to do so by the trial court. The father stated that he is financially capable of providing for the child's needs.
In addition to the child at issue in this case, the father has another child, conceived with a woman other than the mother or his current wife, while the father and the mother were separated; that child was two or three years old at the time of the final hearing. The father testified that he did not pay child support for the benefit of that child and that he had no contact with that child.
When asked if he was willing to assume responsibility for the care, custody, and control of the child, the father answered in the affirmative. The father denied having a drug or alcohol problem. The father testified that when he spoke to the child or visited the child, the child referred to him as "dad." The father acknowledged that since he last visited the child in December 2006, he had not been the type of father to the child that he would like to be and that the child did not consider him a regular male figure in his life.
The maternal grandmother, who was 59 years old at the time of the final hearing, and the maternal grandfather, who was 58 years old at the time of the final hearing, moved to Alabama in August 2001. The maternal grandmother and the maternal grandfather are both employed by government agencies. The maternal grandmother and the maternal grandfather are in good health.
The maternal grandmother testified that after the mother died, they had no contact information for the father. The maternal grandmother explained that the mother was the only one who knew the father's contact information and that her sudden death resulted in their not knowing how to reach the father. The maternal grandmother testified that, at that time, she did not know where the father worked. According to the maternal grandmother, she finally contacted the father when he called and left a message on her answering machine one month after the mother died.
The maternal grandmother testified that she spoke with the father by telephone on three occasions in the latter part of 2005 after the death of the mother. According to the maternal grandmother, from October 2005 to August 2007, the father had visited with the child three times. The *899 maternal grandmother testified that she never discouraged the father from visiting the child. The maternal grandmother stated that the father had never acted inappropriately with the child during his visits with the child. The maternal grandmother testified that the child was not upset when the father left following a visit. The maternal grandmother stated that the father had not visited the child since December 2006.
According to the maternal grandmother, the father's contact with the child was inconsistent. The maternal grandmother testified that, after the father visited the child in December 2005, he did not call the child in January 2006. The father called the child in February 2006, and from March 2006 to June 2006, he contacted the child a few times. The maternal grandmother testified that the father did not call the child in August or September 2006 but that he next called the child in October or November of 2006. According to the maternal grandmother, after the father visited the child in December 2006, the father failed to call the child in January 2007, but he called the child in the spring of 2007 to tell the child that he was buying a house in Texas. The maternal grandmother testified that after April 2007, the father had no further contact with the child. The maternal grandmother further testified that the father had left no telephone messages since April 2007. The maternal grandmother stated that she did not discourage communication between the father and the child. The maternal grandmother testified that neither she nor the maternal grandfather had ever declined to answer the father's telephone calls.
According to the maternal grandmother, the father sent the child a birthday gift in November 2006. The maternal grandmother testified that the child had received no gifts from the father in 2007. The maternal grandmother further testified that the father had not sent the child any cards or letters since the mother died in October 2005.
The maternal grandmother testified that she did not discuss child support with the father but that the father never offered her financial assistance to defray the costs of caring for the child. The maternal grandmother denied telling the father that they did not need any financial assistance. The maternal grandmother explained that the maternal grandfather had discussed the issue of child support with the father. However, the maternal grandmother stated that she did not know specifics about the maternal grandfather and the father's discussion. The maternal grandfather did not testify at the final hearing.
According to the maternal grandmother, the child is thriving in the maternal grandparents' custody. The maternal grandmother testified that the child attends a private school and makes good grades. The maternal grandmother testified that the child had not mentioned the father during the three months preceding the final hearing. The maternal grandmother explained that the father's inconsistent contact with the child precipitated the maternal grandparents filing the petition to terminate the father's parental rights.
K.S., the father's wife, testified that she had been present during visitation with the child and the father in February 2006 and that the child and the father interacted well together. K.S. estimated that the father had called and left messages for the child with the maternal grandparents at least three times in the last six months. According to K.S., the father talked to the child on the telephone within the last month or two.
On appeal, the father contends that the trial court erred by terminating *900 his parental rights to the child because, he argues, the termination of his parental rights was not in the best interest of the child. The father contends that the evidence presented to the trial court indicated that the maternal grandparents prevented him from maintaining contact with the child and that he had not abandoned the child when, in fact, he says he had contact with the child within six months of the date on which the maternal grandparents filed their petition to terminate his parental rights.
This court's standard of appellate review of judgments terminating parental rights is well-settled. A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep't of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is `required to apply a presumption of correctness to the trial court's finding[s]' when the trial court bases its decision on conflicting ore tenus evidence. Ex parte State Dep't of Human Res., 834 So.2d 117, 122 (Ala. 2002) (emphasis added). Additionally, we will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972."
J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
When a nonparent petitions to terminate the parental rights of a parent, a trial court must make a finding of dependency. Ex parte Beasley, 564 So.2d 950 (Ala.1990). Further, our trial courts use a two-pronged test to determine whether to terminate parental rights:
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights."
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004) (citing Ex parte Beasley, 564 So.2d at 954).
Section 26-18-7, Ala.Code 1975, sets forth the statutory authority for the termination of parental rights. That section provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.

"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration *901 or nature as to render the parent unable to care for the needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.

"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.

"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
(Emphasis added.) "Abandonment" is defined as follows:
"(1) Abandonment. A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 26-18-3(1), Ala.Code 1975.
The evidence presented to the trial court indicated that after the father learned of the mother's death, he did not return to Alabama to retrieve the child from the maternal grandparents' custody. The father returned to Alabama in December 2005 when he was required to appear in *902 Alabama to defend against the maternal grandparents' dependency petition. At that time, the father had a brief visit with the child and returned to Texas; he did not attempt to regain custody of the child at that time.
The trial court heard conflicting evidence regarding the number of times the father had visited the child and the father's attempts to contact the child by telephone. The father testified that he had visited with the child in December 2005, February 2006, and December 2006. The father also estimated that he had brief visits with the child five times in conjunction with hearings before the trial court. However, when questioned further by the trial court, the father acknowledged that he had not appeared five times for hearings before the trial court. The maternal grandmother testified that she had never discouraged the father from visiting the child. It is undisputed that the father had not visited the child since December 2006.
The father did not maintain consistent contact with the child. The father testified regarding several instances when he left messages for the child that were not returned. The maternal grandmother testified that she and the maternal grandfather had never purposefully refused to answer the father's telephone calls. The father testified that the last telephone message he left for the child was in June 2007; however, the maternal grandmother testified that the father last left a telephone message for the child in April 2007. The father stated that he last spoke to the child in February 2007.
In B.R. v. M.M., 669 So.2d 982 (Ala.Civ. App.1995), a case cited by the father in support of his argument on appeal, the child's maternal grandparents petitioned for custody of the child approximately three months after the child's mother died. The maternal grandparents later amended their petition to allege that the father had abandoned the child and to seek the termination of the father's parental rights. Thereafter, the father promptly filed a petition seeking custody of the child.
During an ore tenus hearing, the trial court in B.R. v. M.M. considered evidence indicating that the father had failed to pay child support for the minor child, although he had been ordered by a trial court to do so and was financially able to pay child support. The father admitted that he had not maintained regular contact with the child; however, he testified that he had attempted to maintain regular contact with the child but that the maternal grandmother would not allow it. B.R. v. M.M., 669 So.2d at 983. The paternal grandmother also testified that the maternal grandmother had refused to allow the father to visit the child. The father expressed interest in obtaining custody of the child.
The trial court in B.R. v. M.M. denied the maternal grandparents' petition to terminate the father's parental rights, found the child dependent, and awarded the Department of Human Resources legal custody of the child. The maternal grandparents appealed. On appeal, this court declined to reverse the trial court's judgment, holding that the record failed to disclose clear and convincing evidence that the best interests of the child would be served by terminating the father's parental rights and that evidence suggested that multiple, viable alternatives existed to the termination of the father's parental rights. B.R. v. M.M., 669 So.2d at 984.
The facts in the instant case are distinguishable from those in B.R. v. M.M. In the case at bar, the father never filed a petition seeking custody of the child. Further, the maternal grandparents in the instant case, unlike the maternal grandmother in B.R. v. M.M., allowed the father to exercise visitation with the child and did *903 not discourage the father from developing a relationship with the child. In this case, the limited visits with the child and the brevity of those visits were the result of the father's actions.
It is well settled that the paramount concern in proceedings to terminate parental rights is the best interest of the child. See Ex parte J.R., 896 So.2d 416, 423 (Ala.2004); A.A. v. Cleburne County Dep't of Human Res., 912 So.2d 261, 264 (Ala.Civ.App.2005). "The trial court, as opposed to a reviewing court, is in the best position to evaluate the circumstances of each case and to determine the best interests of the [child]." A.R.E. v. E.S.W., 702 So.2d 138, 141 (Ala.Civ.App.1997). Likewise, the trial court is in the best position to resolve conflicts in evidence offered by the parties at the final hearing. See D.M. v. Walker County Dep't of Human Res., 919 So.2d 1197, 1214 (Ala.Civ.App.2005) (quoting Ethridge v. Wright, 688 So.2d 818, 820 (Ala.Civ.App.1996)) ("`The trial court, as the finder of fact, is required to resolve conflicts in the evidence.'").
At the time of the final hearing in this matter, the child was almost seven years old. The child had been in the maternal grandparents' custody for 21 months preceding the final hearing. During those 21 months, the father paid no child support for the child, although he was financially able to do so. The father sent the child no letters or cards during that time. While the child was in the custody of the maternal grandparents, the father visited the child intermittently. Although the father blamed his inability to visit the child on his job and the length of the drive from Texas to Alabama, the father never requested that the child return with him to Texas for an extended visit. At the time of the final hearing, the father had never petitioned the court for custody of the child. Based on the evidence presented at the final hearing, the trial court could have concluded that the father was content to maintain the status quo and leave the child with the maternal grandparents for the foreseeable future. Further, the trial court could have reasonably concluded that allowing the father to interject himself into the child's life every few months if his schedule permitted was not in the best interest of the child. At the time the maternal grandparents petitioned to terminate the father's parental rights, he had not seen the child for five months; the father had not seen the child for eight months at the time of the August 2007 hearing. Given the evidence presented to the trial court, we conclude that the father had abandoned the child. See § 26-18-3(1), Ala.Code 1975; J.C. v. State Dep't of Human Res., supra.
The father further contends that the trial court failed to consider all viable alternatives before terminating his parental rights. The father does not suggest in his brief on appeal what viable alternatives the trial court failed to consider; he merely states that the trial court failed to consider any viable alternatives. In support of his argument on appeal, the father cites B.R. v. M.M., discussed infra. However, B.R. v. M.M. does not support the father's argument that the trial court failed to consider all viable alternatives to the termination of his parental rights.
In its August 29, 2007, judgment, the trial court found that no viable alternatives existed to the termination of the father's parental rights. The record indicates that the trial court considered and rejected continuing custody of the child with the maternal grandparents while allowing the father to exercise visitation with the child. Further, placing the child with the father's family was not a viable alternative given that the father's and the mother's families had no interaction and the child had had *904 no interaction with the father's family in at least two and one half years. Therefore, we conclude that the trial court properly considered and rejected all viable alternatives to the termination of the father's parental rights. See Beasley, 564 So.2d at 952. The father failed to show that the trial court erred in reaching that conclusion.
Because the judgment of the trial court terminating the father's parental rights to the child and finding that no viable alternatives to termination of the father's parental rights existed was supported by clear and convincing evidence, we affirm the judgment terminating the father's parental rights.
AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs in the result, without writing.
MOORE, J., concurs in the result, with writing.
MOORE, Judge, concurring in the result.
I concur with the result reached by the main opinion, but I do not agree entirely with its analysis. Therefore, I set out below my reasoning as to why the juvenile court did not commit reversible error in terminating the father's parental rights.
Pursuant to Ala.Code 1975, § 26-18-7(c), if a parent has abandoned a child and that abandonment continues for a period of four months next preceding the filing of the petition to terminate parental rights, those facts raise a rebuttable presumption that the parent is unable or unwilling to act as parent to the child. In this case, the maternal grandparents filed their petition to terminate the father's parental rights on May 1, 2007. The juvenile court applied the § 26-18-7(c) presumption after determining that the father had abandoned the child and that the abandonment had continued during the four months next preceding the filing of the petition. The father maintains that the juvenile court erred in finding abandonment because, he says, he telephoned or attempted to telephone the child numerous times between January and February 2007.
As set out in the main opinion, "abandonment" is statutorily defined as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
Ala.Code 1975, § 26-18-3(1). This court has construed the foregoing statute as setting out multiple, alternative grounds upon which a juvenile court may find that a parent has abandoned a child. See J.L. v. State Dep't of Human Res., 961 So.2d 839, 848-49 (Ala.Civ.App.2007). However, all these grounds share at least one common characteristicthey are all directed at the failure of the parent to assume and exercise his or her parental rights and duties in relation to the child.
Assuming the evidence established that the father had telephoned the child throughout January and February 2007, that fact establishes only that the father maintained contact with the child. It does not overcome the undisputed evidence indicating that, after the mother's death, the father never claimed his rights as a parent by petitioning for custody or for increased visitation rightshe consistently failed to exercise the monthly visitation rights he had been granted by the juvenile court on December 16, 2005, and he never paid any *905 child support. Maintaining contact, although integral to any personal relationship, is not tantamount to claiming parental rights or discharging parental duties. The juvenile court therefore correctly determined that the father had abandoned the child.
The father essentially argues in his brief to this court that he is, in fact, able and willing to properly parent the child, which, if proven, would rebut the presumption raised by his abandonment of the child. See A.J.H.T. v. K.O.H., 983 So.2d 394, 400 (Ala.Civ.App.2007) (Moore, J., concurring in part and dissenting in part) ("if evidence of the parent's current conditions shows that the parent is, in fact, able and willing to discharge his or her responsibilities to the child, the presumption of unfitness raised by the parent's abandonment of the child would be rebutted"). However, even assuming that there was some evidence indicating that the father may have been able to parent the child, clear and convincing evidence demonstrated that he was obviously not willing to discharge his parental responsibilities. The father had no contact with the child after February 2007. Although he had sufficient funds to support the child, he did not undertake any attempt to do so. He did not make any effort to regain custody of the child, even after the maternal grandparents filed their petition to terminate his parental rights. The record evidence very clearly supports the inference that the father was content to leave the custody and care of the child to the maternal grandparents. Under these circumstances, the juvenile court was justified in concluding that the maternal grandparents had sufficiently proven grounds for termination.
The father next argues that the juvenile court did not explore viable alternatives before terminating his parental rights. As recently stated by our supreme court, in termination-of-parental-rights cases the juvenile court must "ensure that `all viable alternatives to a termination of parental rights have been considered.'" Ex parte T.V., 971 So.2d 1, 5 (Ala.2007) (quoting Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990)). The genesis of the "viable alternatives" prong of the Beasley test has been well-documented. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 85-91 (Ala.Civ.App.2003) (plurality opinion); N.J. v. Madison County Dep't of Human Res., 980 So.2d 997, 1001 (Ala.Civ.App.2007) (plurality opinion); and Ex parte F.P., 857 So.2d 125, 144 (Ala.2003) (Stuart, J., dissenting). That standard originated as a means of protecting the constitutional rights of parents by assuring that their fundamental right to the care, custody, and control of their natural children could be completely, legally eradicated only if warranted by a compelling governmental interest and if "less drastic measures would be unavailing." Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala.1976).
However, under longstanding Alabama law, when clear and convincing evidence indicates that a parent has abandoned a child, that knowing, voluntary, and intentional conduct acts as a forfeiture of the parent's custodial rights to the child. See Ex parte G.C., 924 So.2d 651 (Ala.2005) (plurality opinion); Ex parte Terry, 494 So.2d 628 (Ala.1986); Albano v. Schofield, 45 Ala.App. 257, 260, 229 So.2d 33, 35 (Civ.1969); and Children's Aid Soc'y v. Davis, 211 Ala. 344, 100 So. 325 (1924).[2] *906 Generally speaking, a constitutional right may be waived by a person who, with full knowledge of his or her right, acts in such a manner as to unequivocally indicate his or her intention not to exercise that right. See, e.g., Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In the context of parental rights, the Supreme Court of the United States has stated:
"[T]he mere existence of a biological link does not merit equivalent constitutional protection [as the rights of an unwed father who has `demonstrated a full commitment to the responsibilities of parenthood']. The actions of judges neither create nor sever genetic bonds. `[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children as well as from the fact of blood relationship.'
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."
Lehr v. Robertson, 463 U.S. 248, 261-62, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (citations omitted; footnote omitted). Although speaking directly to the rights of unwed fathers, the Lehr opinion illustrates that a parent, who knowingly and voluntarily fails or refuses to assume a parental role, is not entitled to the constitutional protection afforded by the Due Process Clause of the United States Constitution based solely on a mere biological link to the child. See J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475, 483 n. 7 (Ala.Civ.App.2003) (plurality opinion) (citing Lehr and arguing that a natural father who has abandoned the child and has no substantial relationship with child thereby loses due-process and statutory rights normally associated with the parent-child relationship).
By abandoning the child, the father in this case forfeited his constitutional right to the care, custody, and control of the child. By forfeiting that right, the father likewise forfeited the substantive due-process rights recognized in Roe v. Conn, supra. In short, once a parent forfeits his or her fundamental constitutional right to the care, custody, and control of a child, there is no substantive right existing that requires due-process protection. Hence, a juvenile court should be able to terminate the parental rights of a parent who has abandoned a child without first determining whether some less drastic alternative is unavailing.
Even if the father did retain his due-process rights despite his abandonment of the child, the judgment of the juvenile court is not due to be reversed. Clear and convincing evidence proved that the father was unwilling to foster a meaningful parent-child relationship with the child. As this court has noted, viable alternatives are those measures taken to overcome the circumstances preventing a beneficial parent-child relationship or those actions taken to preserve the favorable aspects of the parent-child relationship when correction is *907 not possible. See D.M.P., supra. In this case, clear and convincing evidence shows that the father is unwilling to parent the child. What corrective measures could the juvenile court take to make the father willing? What favorable aspect of the parent-child relationship is worth preserving? As the main opinion duly notes, the father presents no argument on these crucial points. ___ So.2d at ___. Accordingly, the juvenile court did not err by concluding that there was no viable alternative but to terminate the father's parental rights in light of the overwhelming evidence of the father's abandonment of, and lack of any meaningful relationship with, the child.
Finally, the father argues that the juvenile court erred in finding that it was in the best interests of the child to terminate his parental rights. As I have previously stated, I do not believe a juvenile court has to make a "best interests" determination in the adjudicatory phase of a termination-of-parental-rights case. See J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1196 (Ala.Civ.App.2007) (Moore, J., concurring specially). Nevertheless, to the extent that the law requires such a finding, I agree with the reasoning of the main opinion that the juvenile court did not exceed its discretion in determining that it was in the best interests of the child to terminate the father's parental rights.
NOTES
[1] The record indicates that the delay between the filing of the maternal grandparents' dependency petition and the trial court's finding of dependency resulted, in part, from difficulties associated with perfecting service on the father.
[2] In enacting § 26-18-7(c), the Alabama Legislature has modified the common law by declaring that abandonment creates only a rebuttable presumption that the parent is unable or unwilling to act as a parent. However, when the parent fails to rebut that presumption, grounds for termination are established and the juvenile court may terminate parental rights. Therefore, just as under the common law, unrebutted evidence of abandonment acts as a forfeiture of parental rights.